**COALITION OF CITIES FOR AFFORDABLE UTILITY RATES, et al., Petitioners,**

v.

**PUBLIC UTILITY COMMISSION OF TEXAS, et al., Respondents.**

No. C-9287.

Supreme Court of Texas.

Sept. 12, 1990.

Rehearing Overruled Nov. 28, 1990.

---

Jim Boyle, Jonathan W. Needle, John Laakso, Grace Casstevens, Austin, for petitioners.

Jim Mattox, Mary F. Keller, Larry J. Laurent, Susan D. Bergen, Karen Pettigrew, Barry Bishop, John F. Williams, Mark I. Hefter, Austin, for respondents.

## OPINION

DOGGETT, Justice.

In this appeal certain consumers of a public utility urge that it be denied a second opportunity to prove the same facts as justification for an electric rate increase. We agree that the public utility regulatory scheme set forth by the legislature provides that once is enough. The doctrines of *res judicata* and collateral estoppel bar such relitigation before the Public Utility Commission ("PUC").

Gulf States Utilities Company ("GSU") sought a rate increase which required the PUC to determine whether the $4.5 billion that GSU spent for completion of the River Bend Nuclear Power Plant was a prudently incurred cost.[1] This expense was challenged by the petitioners [2] who intervened in the rate case before the PUC. As GSU has noted, "[e]very factual, legal and policy

---

1. Gulf States' application for authority to change rates, designated docket no. 7195, was consolidated by the Commission with docket no. 6755, which inquired whether the $4.5 billion spent to construct River Bend was a prudently incurred expense.

2. The petitioners are Coalition of Cities for Affordable Utility Rates ("Coalition") representing Conroe, Cut–N–Shoot, Huntsville, Panorama Village, Somerville, West Orange and Willis; the Cities of Bridge City, Groves, Nederland, Port Arthur, Port Neches and Vidor; and the Office of Public Utility Counsel.

issue was thoroughly explored and canvassed", during the resulting hearings that continued for 132 days and cost ratepayers approximately $12 million. Thereafter the PUC issued a final order containing the following findings of fact and conclusions of law that are central to the present controversy:

*Finding 164:* The preponderance of the evidence in this case establishes that $2.273 billion of River Bend capital costs were prudently and reasonably incurred. The evidence is inadequate to support a finding of either prudence or imprudence with regard to construction costs in excess of $2.273 billion, with the exception of the costs related to the 50–month schedule and TDI, addressed in Findings of Fact Nos. 133 and 145.

*Finding 164A:* GSU's share of all River Bend capital costs in excess of $2.273 billion should be excluded from plant in service at this time for lack of sufficient evidence as to the prudence and reasonableness of those costs. The amount which should be included in plant in service, given GSU's 70 percent share of the plant, is $1.5911 billion.

*Conclusion of Law 10:* Pursuant to PURA Sections 16(a), 38, 39(a), and 41,[3] the Commission may reexamine on rehearing or in a subsequent proceeding the prudence and reasonableness of those River Bend construction costs regarding which the evidence is inadequate to support a finding of either prudence or imprudence.

*Conclusion of Law 15:* Under PURA Section 40 a utility must prove its conduct to have been prudent when decisions or expenditures are reasonably challenged.

*Conclusion of Law 18:* $1,453,520,982 of GSU's share of end-of-test-year River Bend capital costs should not be included from GSU's rate base as invested capital used and useful in rendering service to the public pursuant to PURA Sections 38, 39, and 41.

*Conclusion of Law 18A:* GSU has not met its burden of proving that the capital costs of River Bend above a reasonable Definitive Cost Estimate of $2.273 billion were reasonably and prudently incurred.

In summary, the PUC found that GSU had failed to prove that any expenses in excess of $2.273 billion were prudently incurred. Two of the three commissioners voted to allow GSU further opportunity to prove the prudence of an additional $1.453 billion, which apparently represented GSU's share of cost overruns on the project. In taking this action, the PUC rejected its hearing examiner's proposed conclusion of law that *res judicata* would prohibit reexamination of the prudence issue.

GSU appealed the final order and simultaneously initiated a new proceeding before the PUC on the same prudence question.[4] The petitioners also appealed and, based on *res judicata,* obtained from the trial court a permanent injunction preventing further consideration of this issue by the PUC. The court of appeals, however, dissolved the permanent injunction and ruled that the doctrine of *res judicata* was inapplicable because the PUC had specifically reserved the right to rehear the prudence issue in conclusion of law 10. 777 S.W.2d 814, 816. The court cited no authority to support its *res judicata* holding, but merely compared the PUC action to a severance authorized by Texas Rule of Civil Procedure 41. *Id.* at 817. Because we disagree with this conclusion, we reverse the court of appeals' judgment.

In *Bonniwell v. Beech Aircraft Corp.,* 663 S.W.2d 816, 818 (Tex.1984), we considered the doctrines of *res judicata* and collateral estoppel. *Res judicata,* a matter judicially determined, bars the retrial of claims pertaining to the same cause

---

3. The Public Utility Regulatory Act, Tex.Rev.Civ. Stat.Ann. art. 1446c (Vernon Supp.1990), will be referenced as PURA throughout the opinion.

4. The consolidated administrative appeal of GSU and the petitioners is currently pending in the 250th District Court of Travis County as cause no. 447,502. The action before us was severed from that cause and assigned cause no. 447,502A. The new docket granted by the Commission to relitigate the prudence issue has been designated as docket no. 8702.

of action which has been finally adjudicated. Collateral estoppel or issue preclusion is more narrow, precluding only the relitigation of identical issues of fact that have been actually litigated. To invoke either doctrine, the prior judgment must involve, the same issues, subject matter, and parties or those in privity.

Texas has made limited use of *res judicata* in an administrative context.[5] *See Sexton v. Mount Olivet Cemetery Ass'n*, 720 S.W.2d 129, 138–142 (Tex.App.—Austin 1986, writ ref'd n.r.e.). Voicing an awareness of the usefulness of *res judicata* in administrative proceedings, this court in *Westheimer Indep. School Dist. v. Brockette*, 567 S.W.2d 780, 787 (Tex.1978), expressed a strong preference that "[c]ontinued litigation of issues or piecemeal litigation should be discouraged" in state regulatory agencies.

Ironically, GSU was the first party to urge the applicability of *res judicata* and collateral estoppel in this proceeding. GSU maintained initially that the doctrines precluded the PUC from considering the prudence of the River Bend construction, which it had previously authorized by granting a certificate of convenience and necessity. Additionally, counsel for the PUC acknowledged during oral arguments before this court that *res judicata* would prohibit relitigation regarding the $2.273 billion found prudent by the PUC. Petitioners correctly characterize the PUC's position as seeking to apply *res judicata* to the portion of costs that GSU proved and rejecting its application to costs not proved.

Excepting the oral argument of counsel for GSU, everyone involved in these proceedings agrees with the court of appeals that *res judicata* could apply to PUC ratemaking "[u]nder proper circumstances...." 777 S.W.2d at 815. The more narrow question we confront is whether the doctrine should be rejected because of any aspect of this particular proceeding, the PUC's final order, or the

statute by which the order was authorized. At issue here is not increased operating expenses or the appropriate rate of return—factors that can change over time. Rather, every fact involved is historical; the amount and wisdom of these construction expenditures will remain constant no matter how many times the PUC permits relitigation addressing them. All of the same parties participated vigorously in the initial contest with each presenting its own evidence and cross-examining its opponent's witnesses. Were this not true, imposition of *res judicata* principles would be inappropriate.

■ Given these circumstances, if the PUC's final order had been unequivocal, there could be no question that the doctrine applies. But is it precluded by the PUC's conclusion of law 10, permitting further proceedings and attempting a deferral rather than a determination of the issue? In answering this question we look first to the terms of the order and the controversy it addresses. A utility has the burden to prove the prudence and reasonableness of its expenditures before a rate increase can be approved. PURA § 40; *see also Public Util. Comm'n v. Houston Lighting & Power Co.*, 778 S.W.2d 195, 198 (Tex.App.—Austin 1989, no writ). By simply opening its books to inspection, a utility enjoys no presumption that the expenditures reflected therein have been prudently incurred. A utility carries the burden of proof even when it does not initiate the proceedings. *Suburban Util. Corp. v. Public Util. Comm'n*, 652 S.W.2d 358, 366 (Tex.1983).

■ In this rate case, the PUC declared that GSU failed to meet its burden of proof to show that the entire $4.5 billion expense was prudently incurred. Because of a "lack of sufficient evidence", the PUC, in its finding 164A, "excluded from plant in service" all "capital costs in excess of $2.273 billion." A party who fails to meet

---

5. By narrowly applying *res judicata* to historical investment facts in a ratemaking proceeding under the conditions set forth herein, today's opinion continues this tradition of the restricted use of *res judicata* in administrative proceedings. Contrary to the suggestion of the dissent, the Court is in no way "impart[ing] collateral estoppel and res judicata effect on all actions and *inactions* by administrative agencies." Page 569 (Gonzalez, J., dissenting).

its burden of proof loses. The party who has the burden but fails to persuade the trier of fact is not entitled to a second trial to present more evidence. By stating that GSU failed to meet its burden of proof on the prudence of the $1.453 billion, the PUC effectively disallowed that amount from the rate base. *See Gerst v. Goldsbury,* 434 S.W.2d 665, 667 (Tex.1967) (agency determination that applicant offered "insufficient evidence of a public need for the proposed [savings] association" constituted a "negative finding").

More importantly, the PUC order must be considered final unless the PUC has the statutory power to defer and reconsider such critical issues. Such was the holding in *Sexton v. Mount Olivet Cemetery Ass'n,* 720 S.W.2d at 146, in which the Banking Commissioner sought to revisit an issue determined in a prior order relating to prepaid funeral plan regulation. As in the instant case, the order had expressly reserved the discretion to make new determinations at a later time. Refusing to permit a reopening of the final order, the court held that an attempted reservation of power is meaningless unless the legislature has specifically delegated such authority to an agency.

■ The PUC sought to base its attempted reservation of the right to reconsider the cost question presented by GSU on PURA sections 16(a), 38, 39(a), and 41. Nothing contained in sections 38, 39(a) and 41, either directly or indirectly, entitles the PUC to grant a utility multiple chances to prove the prudence of its investment. Section 16(a) does state the PUC's power "to do all things, whether specifically designated by this Act or implied herein, necessary and convenient to the exercise of this power and jurisdiction." It was hardly *necessary* to initiate a new docket to consider the $1.453 billion since the PUC could have sought additional guidance by remanding to the hearing examiner for further development of the evidence. Moreover, the PUC can only do what is *necessary* and *convenient* with regard to powers "specifically designated ... or implied herein ..." by other provisions of PURA. There is no language in this or any other section of PURA that allows the PUC to bifurcate into multiple proceedings the issue of a single investment's prudence.

The only legislative authorization for PUC reexamination of an earlier determination concerns the power to revoke or amend a certificate of convenience and necessity under certain circumstances outlined in PURA section 62(a). This section represents a clear delegation of authority for the PUC to reopen a matter previously considered. The legislature was, thus, quite capable of expressly approving the PUC reexamination of earlier determinations, but chose not to extend this authority to ratemaking. Thus, limited by statute and lacking any inherent power, the PUC was powerless to defer its decision to a future proceeding.

■ The court of appeals was correct in characterizing the ratemaking proceeding as a trial, but incorrect in comparing the PUC action in conclusion of law 10 "to that of the trial court in severing a claim and proceeding separately with it. Tex.R. Civ.P. 41." 777 S.W.2d at 817. Severance in a trial court is proper only when the suit involves two or more separate and distinct causes of action. Each of these causes must be such that it could be properly tried and determined as if it were the only claim in controversy. *Kansas Univ. Endowment Ass'n v. King,* 162 Tex. 599, 611–612, 350 S.W.2d 11, 19 (1961). The severed causes of action should not be so interwoven as to require the introduction of evidence on the same facts and issues. Furthermore, severance should not be used merely as a device to save a party from failure to prepare properly for trial or to present adequate evidence. Nor does Rule 41 permit a trial court to sever a case after it has been submitted to the trier of fact. That is the type of "severance" the PUC directed here. What happened in this case is more appropriately compared to an improper post-trial attempt to split a cause of action. Nothing in either PURA or the Administrative Procedure and Texas Register Act, Tex.Rev.Civ.Stat.Ann. art. 6252–13a (Vernon Supp.1990), allows a division

of the investment rate base in ratemaking proceedings.[6]

Once the order in the initial docket became final, it was not subject to any further PUC review. *Public Util. Comm'n v. Brazos Elec. Power Coop., Inc.*, 723 S.W.2d 171, 173 (Tex.App.—Austin 1986, writ ref'd n.r.e.). The prudence of spending the entire $4.5 billion to construct the River Bend Nuclear Power Plant had already been vigorously litigated in hearings that afforded GSU ample opportunity to justify all of its costs. The thrust of the new proceeding was to separate for reconsideration the prudence of $1.453 billion of this expenditure, a part of the total investment. This portion, representing GSU's share of cost overruns, had necessarily been previously considered.

All parties were entitled to a straightforward decision from the PUC the first time that this case was presented. Permitting relitigation offends the policy reasons supporting the doctrines of *res judicata* and collateral estoppel. Both a public utility and consumers benefit from a final decision about whether cost overruns at a power plant have been sufficiently justified. With a complex and controversial project like a nuclear power installation, a utility and its investors need a determination to prevent relitigation of the same previous investment decision on each occasion that a rate increase is requested. The same finality that benefits the utility investors can serve the interests of consumers who know that if a utility is once denied relief because of its failure to prove its case, it may not

return repeatedly on the same facts until the PUC yields. To reject *res judicata* for historical investment facts in a ratemaking proceeding would allow a public utility to secure victory not by the strength of its case but simply by outlasting its opponents. Accordingly, we hold that the doctrines of *res judicata* and collateral estoppel bar a utility from relitigating before the PUC the prudence of its past investment for inclusion in that utility's rate base. We reverse the judgment of the court of appeals and affirm that of the trial court.[7]

GONZALEZ and COOK, JJ., dissent.

GONZALEZ, Justice, dissenting.

I agree with the court that a litigant involved in an administrative hearing is entitled to only one adjudication. I disagree, however, that there has been a valid adjudication in this case.[1] I also agree with the court that the Commission is not authorized to defer deciding or to sever part of the issue in question. However, no matter how erroneous this severance or deferral was, we should not penalize a litigant for an error made by the Commission through no fault of the litigant. Since the Commission made only a partial determination of what costs were reasonable and prudent and held in abeyance the balance of the issue, it is inappropriate to apply the principles of res judicata and collateral estoppel to *any* portion of this case. I would affirm the court of appeals' dissolution of the permanent injunction.[2] However, I

---

**6.** We note the difference between a "separate trial" and a "severance". *Compare* Tex.R.Civ.P. 40(b) *with* Tex.R.Civ.P. 41. The PUC did not decide at the onset of the initial docket to hold separate hearings on various issues in a manner comparable to Rule 40(b). Rather its conduct was analogous to splitting a cause of action after submission to the trier of fact in violation of Rule 41.

**7.** All issues relating to the merits of the administrative order, including the prudence of all elements of construction costs, remain to be addressed by the trial court where the consolidated appeals of the parties are pending as cause no. 447,502. In this proceeding the burden is upon GSU to show that the PUC's order is not supported by substantial evidence. The claim of the dissent that we have at this point "as-

sess[ed] a $1.453 billion penalty (permanent disallowance) on GSU", page 568 (Gonzalez, J., dissenting), is incorrect.

**1.** GSU claimed that the $4.5 billion spent on the nuclear project was reasonably and prudently incurred. The Commission decided to defer making a decision of whether any cost in excess of $2.273 billion (adjusted cost estimate) were prudently incurred. It was the Commission's expressed intent to review the prudence or imprudence of the additional cost in a subsequent proceeding.

**2.** The determination of the prudence of the entire $4.5 billion expenditure has resulted in a multiplicity of suits because the Commission effectively severed its decision as to the portion

would not allow the litigants to present further evidence because they have had a full and fair opportunity to participate in the adjudicatory process. I would instruct the Commission to make a valid adjudication based on the record as it now exists.[3] Under no circumstances would I apply res judicata and collateral estoppel to this case.

*Res judicata* makes final a matter which has been finally adjudged on its merits. See *Abbott Laboratories v. Gravis*, 470 S.W.2d 639, 642 (Tex.1971). Collateral estoppel is a much narrower doctrine pertaining to the preclusion of issues. We have said that a party to a lawsuit may invoke the doctrine by establishing:

(1) the facts sought to be litigated in the second action were fully and fairly litigated in the prior action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action.

*Bonniwell v. Beech Aircraft Corp.*, 663 S.W.2d 816, 818 (Tex.1984). In short, res judicata prevents the relitigation of adjudicated claims (claim preclusion) and collat-

eral estoppel bars the relitigation of adjudicated issues (issue preclusion). An essential element of both doctrines is that the rendering tribunal actually determined the issue or claim to be precluded on its own merits.

There are several indicators that support the court of appeals' conclusion that the Commission postponed making a decision on a major portion of GSU's claim:

1. The Commission argues that it made no decision on the prudence or imprudence of cost in excess of $2.273 billion.

2. The record shows as follows:

(a) The Commission adopted the examiner's findings of fact and conclusions of law in large part but modified some of them in very significant ways. The Commission **refused to adopt** the examiner's proposed conclusion of law 10 which would have provided that the doctrine of res judicata would preclude relitigation of any of the River Bend prudence issues.

---

of costs it determined were prudent from those it reserved for further proceedings. Those cases were docketed in the Commission as #6755 (request for determination regarding prudence of $4.5 billion River Bend expenditure), #7195 (GSU's original application to change rates), and #8702 (determination of prudence of $1.453 billion balance). The Commission consolidated #6755 and #7195 because a determination of the prudence of the expenditures was necessary to set the new rates. After the Commission determined the $2.273 billion expenditure was prudent but left open the balance, the judgment was appealed to the district court.

While that proceeding was pending, the Commission scheduled proceeding #8702 to determine the prudence of the $1.453 billion. The district court issued a temporary injunction enjoining any relitigation of the prudence of the Riverbend expenditures. While the granting of this temporary injunction was on appeal to the court of appeals, the district court granted a permanent injunction stating the relitigation of the prudence issue was barred by res judicata and collateral estoppel and the relitigation would interfere with the district court's jurisdiction over the prudence issue in the administrative appeal of #6755 and #7195. This case comes to us on appeal from the court of appeals decision dissolving the permanent injunction because *res judicata* and collateral estoppel did not bar determination of prudence of the balance of the costs.

Let us end this madness! Since we have settled the issue that the severance was improper, the district court does not have a choice but to follow suit. I would dissolve the injunction but suggest to the parties that they file a plea in abatement in the commission pending remand by the district court of the case now on appeal. Our decision affirming this case would return the *entire case* to the Commission and allow it to make a *single final adjudication* regarding the entire $4.5 billion expenditure.

If the Commission should find that some additional costs were prudent, GSU should not be given a windfall. The Commission should adjust the rates keeping in mind the money already collected based on approved rates.

3. I recognize that the end result may ultimately be the same as that which has already been achieved. The Commission may decide that none of the expenditures in excess of $2.273 billion were prudent. That is its prerogative. We are powerless to make an independent finding on this matter. We should respect the limits of our authority. Also, since this is a case of first impression in Texas, we should dissolve the permanent injunction and permit the Commission to decide the entire case as a whole in order to achieve f·'rness and to facilitate the orderly development of this important area of administrative law.

(b) The Commission **refused to adopt the examiner's proposed finding 164 which recommended a disallowance of $274,015,089.** Instead, the Commission made its own finding 164 and 164(a) and conclusion of law 10.

(c) Finding of fact 164 states that "[t]he preponderance of the evidence in this case establishes that 2.273 billion of River Bend capital costs were prudently and reasonable incurred. The evidence is inadequate to support a finding of *either prudence or imprudence* with regard to construction costs in excess of $2.273 billion ..."

(d) Finding of fact 164A states "... costs in excess of $2.273 billion should be excluded from plant in service **AT THIS TIME** for lack of sufficient evidence as to the prudence and reasonableness of those costs."

(e) Conclusion of law 10 states that "[P]ursuant to PURA Sections 16(a), 38, 39(a) and 41, the Commission may reexamine on rehearing or in a subsequent proceeding the prudence and reasonableness of those River Bend costs regarding which the evidence is inadequate to support a finding of either prudence or imprudence."

(f) Commissioner Thomas in his "concurring" order criticized "the decision of the majority (the two other Commissioners) to hold in abeyance $1.453 billion of the investment in the River Bend Nuclear Plant, to allow the company any opportunity to prove construction prudence on rehearing."

The court examined the above and concluded that *this was a mere effort or attempt* by the Commission to defer or reserve adjudicating the question of the prudence or imprudence of cost in excess of $2.273 billion. The court reached this conclusion by selectively reading only portions of *findings of fact 164 and 164A* and *conclusion of law 10,* and ignoring the rest. In my opinion, this is improper. It is our duty to decide the effects of the Commission's order in light of the literal meaning of the language used by the Commission. We should not pick and choose only those portions of the record that are helpful in reaching a desired result. The court's statement that "... the PUC *found* that GSU had failed to prove that any expenses in excess of $2.273 billion were prudently incurred," Page 562 (emphasis added) is pure fiction. A reasonable reading of the record just does not support this conclusion. On the contrary, the Commission found that it would not allow a return on the $1.453 billion *"AT THIS TIME"* and made no express or implied finding of imprudence with respect to this major portion of GSU's claim.

Our court concludes that because the Commission was not authorized to defer its ruling, its decision to do so is void, not merely voidable.[4] There are numerous decisions by agencies and courts which, though erroneous, are effective until set aside on appeal. In *Schieffer v. Patterson,* we said:

> No matter how erroneous its conclusion and action may have been, it was within the judicial power of the court to determine that the cause was severable

---

**4.** The court finds *Sexton v. Mount Olivet Cemetary Association,* 720 S.W.2d 129 (Tex.App.— Austin 1986, writ ref'd n.r.e.) instructive and persuasive. In *Sexton,* the court of appeals held that the Banking Commission had no power to reopen proceedings and reconsider whether the association would have approval to sell prepaid funeral plans. *Sexton* is distinguishable from the instant case because in *Sexton,* the Banking Commission attempted to exercise jurisdiction after it had made a final decision. Under those circumstances it is clear that any attempt to act after its jurisdiction expired would have been void. See *Plains Growers, Inc. v. Jordan,* 519 S.W.2d 633 (Tex.1974). Although the Banking Commission illegally attempted to reserve the power to reopen cases, this action did not detract from the Commission's *having made a final decision.* In the instant case, the PUC expressly stated that *no decision had been reached* as to $1.453 billion in costs in excess of the amount it expressly approved as being prudent, and invited further proceedings by rehearing or new prodeeding for the issue expressly reserved. The Commission attempted to make its determination final as to the $2.273 billion it found to be prudent by severing its consideration of the balance. The court now transforms this severance into a deemed finding against GSU despite the Commission's express statement that no finding had been made.

and to sever the same accordingly. The order of severance is subject to being set aside on appeal, but until this is done it effectively separates the controversy into two causes. A judgment which fully adjudicates one of the severed causes is appealable even though the entire controversy as it existed prior to the severance is not determined thereby.

433 S.W.2d 418, 419 (Tex.1968) (quoting *Pierce v. Reynolds*, 160 Tex. 198, 329 S.W.2d 76, 78–79 (1959)).[5] Clearly a matter that has been expressly reserved from an order has not been decided, and "the res judicata effects of an action cannot preclude litigation of claims that a trial court explicitly separates or severs from that action." *Van Dyke v. Boswell, O'Toole, Davis & Pickering*, 697 S.W.2d 381, 384 (Tex.1985).

Even though the Commission erred in deferring its decision, that is precisely what it did. Thus, the issue is not whether a public utility is entitled to a second opportunity to prove the same facts as justification for a rate increase, (they are not entitled to two bites at the same apple), but, instead, the central issue is what are the legal consequences or effects that flow from the Commission's error. The court chooses to make an independent finding that the cost overruns in excess of $2.273 billion were imprudent since the Commission did not find that they were prudent. The effect of this decision is to assess a $1.453 **billion** penalty (permanent disallowance) on GSU all in the name of res judicata and collateral estoppel. I do not think that this is fair[6] nor that we have the power to make this "negative finding" when the Commission expressly stated that

it did not find that the costs were prudent or imprudent.[7]

The court today reaches its result by equating an administrative proceeding to a trial and stating that if a finder of fact determines that a party failed to carry its burden of proof on an issue, adjudication should be against that party. This is the case in a regular trial setting, but it may or may not be applicable in an administrative proceeding depending on some factors that are not present in a conventional trial.

Administrative agencies perform (sometimes simultaneously) governmental functions of legislating, executing and enforcing their rules and resolving disputes arising under those rules and laws passed by the legislature. "Agencies do not always resolve disputes in the same manner as courts. Courts base decisions on the application of existing law to particular facts. Agencies, however, may use adjudication as a policy-making technique and focus as much on prospective policy goals and considerations as on the particular dispute." Note, *Collateral Estoppel Effects of Administrative Agency Determinations: Where Should Federal Courts Draw the Line?* 73 Cornell L.Rev. 817, 836 (1988). They also resolve disputes based on their own expertise in a certain area of the law, (e.g., the Railroad Commission and regulation of oil and gas), so they may resolve disputes based on their own predispositions rather than on purely neutral application of the law to the facts. Unlike judges and juries in conventional trials, administrative tribunals are charged with the responsibility of balancing and protecting public interests. See, e.g., Tex.Rev.Civ.Stat.Ann. art. 1446c, §§ 2, 54(c) (Vernon Supp.1990).

---

5. In *Schieffer*, the issue of liability was improperly severed from damages. Our court held that the court of civil appeals had to take and determine the case as severed, unless and until the severance was set aside. 433 S.W.2d at 419.

6. All parties (including GSU) are entitled to an unequivocal decision by the tribunal empowered to make a decision. In this case, it is the Commission and not this court who is empowered by the legislature to calculate utility rates and to protect the public interest by disallowing costs and expenses that are not prudently made.

See *Public Utility Comm'n v. Houston Lighting & Power*, 748 S.W.2d 439 (Tex.1987).

7. The court relies on *Gerst v. Goldsbury*, 434 S.W.2d 665 (Tex.1968) for its conclusion that the failure to rule in GSU's favor is converted into a negative finding. In *Gerst* the commission's finding that there was insufficient evidence on an issue was characterized as a negative finding. However, there was no attempt to reserve the issue for latter decision. The order did not purport to be anything other than a final adjudication on all issues before the commission.

Thus, the analogy to conventional trials does not fit. The court's facile analysis will lead to confusion, has the potential for unintended consequences and will spawn litigation.

All administrative agencies are not created equally. They have differing levels of authority, review powers, and afford varying levels of procedural safeguards. It is not always easy to determine if the administrative agency was acting in a "judicial capacity". In *State v. Thomas*, 766 S.W.2d 217, 219 (Tex.1989), we said that rate-making was a quasi-judicial function. In *State v. Southwestern Bell Telephone Co.*, 526 S.W.2d 526, 529–30 (Tex.1975), we said that the fixing or revision of rates is a legislative function. Only those issues that an agency determines while acting in a judicial capacity and when the parties are given a full and fair opportunity to participate in the adjuratory process should be given preclusive effect. Thus, at the very least, we should establish limits or guidelines to the application of collateral estoppel and res judicata to adjudications by administrative agencies.

The United States Supreme Court has set forth additional requirements before it will give preclusive effect to an administrative decision. In *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966), the Court set forth several requirements:

> (1) the agency must have jurisdiction to resolve the issue; (2) the agency must act in a judicial capacity; (3) the agency must properly resolve the dispute before it; and (4) the parties must have an adequate opportunity to litigate.

*Id.* at 422, 86 S.Ct. at 1560. Application of collateral estoppel to administrative agency decisions in Texas should also pass the traditional test in addition to the standards articulated in *Utah Construction and Mining Co.*

Here it is apparent that the Commission did not properly resolve the dispute before it. Therefore, neither res judicata nor collateral estoppel may operate to preclude claims or issues in this case. If we take the court's decision to its logical conclusion, the effect of today's opinion will be to impart collateral estoppel and res judicata effect on all actions and *inactions* by administrative agencies. As a matter of fundamental fairness, for the reasons expressed above, we should affirm the judgment of the court of appeals dissolving the permanent injunction.

COOK, J., joins in this opinion.