Dalia ESPIRICUETA, Appellant,

v.

Eduardo VARGAS, Appellee.

No. 3–90–233–CV.

Court of Appeals of Texas, Austin.

Nov. 20, 1991.

Rehearing Overruled Jan. 15, 1992.

Lloyd Robles, Law Offices of Philip Juarez, Austin, for appellant.

Jerry Galow, Whitehurst, Harkness & Watson, Austin, for appellee.

Before CARROLL, C.J., and JONES and B.A. SMITH, JJ.

JONES, Justice.

Dalia Espiricueta, appellant, and Eduardo Vargas, appellee, both filed applications for appointment to administer the estate of Espiricueta's deceased daughter, Jessica Annette Vargas. The major asset of Jessica's estate is a personal injury cause of action that survived her death. In a proceeding to determine heirship, the trial court declared Vargas to be Jessica's legal father and, therefore, her heir for purposes of further probate proceedings. Espiricueta appeals, asserting that the trial court erred by finding that Vargas, rather than Espiricueta's former husband, Jaime Luna, was Jessica's legal father. We will affirm the trial court's judgment.

## BACKGROUND

Dalia Espiricueta married Jaime Luna in May 1978. Although the two lived together as husband and wife for only nine months, they did not divorce until December of 1989. During the extended separation, Espiricueta met Eduardo Vargas, with whom she lived for a short time. Shortly after that relationship ended in 1981, Jessica was born. Vargas and Espiricueta did not live together after Jessica's birth, and he visited Jessica only two or three times before her death in January of 1989 from severe burns suffered in an apartment fire. Neither Vargas nor Luna had any significant relationship with Jessica.

After Jessica's death, Espiricueta and Vargas filed competing applications for appointment to administer her estate. Because a decedent's next of kin is entitled to priority of appointment under section 77 of the Probate Code, Tex.Prob.Code Ann. § 77

(1980), the trial court had to decide whether Vargas was Jessica's legal father before appointing an administrator for her estate. After taking evidence on the paternity issue, the court concluded that Vargas was Jessica's legal father and heir and that he should be considered such for purposes of further probate proceedings. Consequently, the trial court declared Vargas and Espiricueta to be Jessica's heirs, assigning each fifty percent of the estate.

After Jessica's death (but before the probate court had declared Vargas to be Jessica's legal father), Espiricueta divorced Luna. The divorce decree recited the court's finding "that a child, Jessica Vargas Luna, was born during the marriage," but that the child had since died. Luna waived citation in the divorce proceedings and the pending proceeding to determine heirship. He also assigned all of his interest in Jessica's estate to Espiricueta. Vargas was not a party to the divorce proceedings and was not given notice of them.

## THE PATERNITY HOLDING

Espiricueta assigns as error the trial court's finding that Eduardo Vargas was Jessica's "legal father" and its failure to find that Jaime Luna was Jessica's legal father. She suggests several grounds on which we may decide that the trial court erred: (1) the divorce decree, reciting that Jessica was born during the marriage of Espiricueta and Luna, bars litigation of Jessica's paternity in the proceeding to determine heirship; (2) Vargas has no standing to deny that Luna is Jessica's father; (3) Vargas has not rebutted the presumption of Luna's paternity by clear and convincing evidence; (4) Vargas cannot be a presumed father under section 12.02 of the Family Code, Tex.Fam.Code Ann. § 12.02 (Supp.1991),[1] because he had not, before Jessica's death, established that he was her father; and (5) even if Vargas is a presumed father, policy and logic compel the conclusion that Luna, rather than Vargas, should be considered Jessica's father.

■ Espiricueta first argues that the divorce decree, which recites that Jessica was born during Espiricueta's marriage to Luna, bars litigation of Jessica's paternity in the present proceeding. We do not agree. Res judicata, the specific type of preclusion Espiricueta contends is applicable here, precludes *the same parties* from relitigating fact issues or questions of law previously determined by a court of competent jurisdiction. *See Coalition of Cities for Affordable Util. Rates v. Public Util. Comm'n,* 798 S.W.2d 560, 563 (Tex.1990); *McGuire v. Commercial Union Ins. Co.,* 431 S.W.2d 347, 352 (Tex.1968). Since Vargas was not a party to Espiricueta's divorce action against Luna, res judicata would not bar Vargas from asserting in the present case that he was Jessica's legal father. *See Jack v. Jack,* 796 S.W.2d 543, 546–47 (Tex.App.1990, no writ).

■ Moreover, we conclude that the recital in the divorce decree that Jessica was "born during the marriage ... [and] is now deceased" does not, in these circumstances, constitute a "decree establishing paternity" within the meaning of section 12.02(b) of the Code. First, the only relevant facts recited in the divorce decree are those giving rise to the § 12.02(a)(1) presumption in the first place: a child was born during the marriage. If such facts constituted a *determination* of paternity, it would be incongruous for section 12.02(a)(1) to provide that they merely gave rise to a presumption. Second, the issue of Jessica's paternity was not raised by the divorce pleadings and, as far as we can tell, was not an issue in the case. *Compare Dreyer v. Greene,* 809 S.W.2d 262 (Tex.App.1991, writ requested).

■ Espiricueta next argues that section 12.06 does not give Vargas standing to deny that Jessica was Luna's legitimate child. Recognizing that section 12.06 permits a husband or wife to rebut the presumption that any child born during a marriage is the legitimate child of the husband, Espiricueta asserts that the spouses' standing to do so is exclusive. Espiricueta contends, therefore, that section 12.06 does not give Vargas standing and that his assertion

---

**1.** All subsequent references to Code sections are    to the Family Code unless otherwise noted.

that he is Jessica's father should not be heard. *See Jack*, 796 S.W.2d at 547–48. However, Espiricueta did not, at any time during the proceedings, bring Vargas's asserted lack of standing to the attention of the trial court. Espiricueta did not plead lack of standing, did not move for a dismissal of the cause on the basis of Vargas's lack of standing, and did not object to his lack of standing at the hearing on the application to determine heirship or afterwards in a motion for new trial. We conclude, therefore, that she has not preserved this complaint for review.[2] *See* Tex. R.App.P. 52(a); *see also Texas Indus. Traffic League v. Railroad Comm'n*, 633 S.W.2d 821, 823 (Tex.1982); *Sabine River Auth. v. Willis*, 369 S.W.2d 348, 350 (Tex. 1963).

Espiricueta argues next that the trial court erred in concluding that Vargas was Jessica's biological father because Vargas failed to rebut by clear and convincing evidence the presumption that Luna was Jessica's father. She likewise denies that Vargas can be considered a presumed father under the Family Code. We conclude that, if the trial court was correct in holding Vargas to be a presumed father, he did not need to "rebut" the presumption that Luna was Jessica's father. Section 12.02(b) instructs that "[i]f two or more presumptions arise that conflict, the presumption that is founded on the weightier considerations of policy and logic controls." Consequently, once the trial court had concluded that Vargas was a *presumed* father, Vargas no longer had the burden of rebutting the presumption respecting Luna by clear and convincing evidence. Instead, section 12.02(b) imposed on the court the duty to determine which of the two presumptions should control. Because we conclude that the trial court did not err in holding Vargas to be a presumed father under section 12.02(a)(4), we do not address the evidentiary argument.

Section 12.02(a)(4) accords a man "presumed-father" status if "without at-

tempting to marry the mother, he consents in writing to be named as the child's father on the child's birth certificate." At the hearing to determine the paternity question, Jessica's birth certificate was admitted into evidence. The words "Eduardo Vargas" appear on the certificate in the space provided for the name of the child's father. The certificate was signed with the name "Eduardo Vargas." Espiricueta argues that the mere fact that Vargas's name was given as the father does not, by itself, show Vargas's consent to be listed as Jessica's father on her birth certificate. The written name was not, however, the only proof of consent before the trial court when it ruled. Espiricueta admitted that Vargas supplied the information for the birth certificate; she also admitted that he signed the certificate while she was still recovering following Jessica's birth. These admissions support the finding that the court necessarily, albeit impliedly, made: that Vargas consented to be listed on the birth certificate as Jessica's father. Vargas was, therefore, rightfully presumed by the trial court to be Jessica's biological father in accordance with section 12.-02(a)(4).

This being the case, we must review the determination that section 12.02(b) directed the trial court to make: which presumption of biological paternity should control? Because the trial court was obligated to weigh considerations of policy and logic, we will reverse its conclusion only if the court clearly abused its discretion in making the decision.

Espiricueta strenuously argues that the court should have assigned greater weight than it did to the presumption that a child born during marriage is the legitimate child of the husband. She cites cases in which the courts have held that this presumption is one of the strongest known to the law. *See Schlang v. Schlang*, 415 S.W.2d 28 (Tex.Civ.App.1967, writ ref'd n.r.e.); *Neff v. Johnson*, 391 S.W.2d 760 (Tex.Civ.App. 1965, no writ). We agree that, historically,

---

**2.** In light of Espiricueta's waiver of this issue, we do not address the question whether a man who is a presumed father under one or more of subsections (2), (3), (4), or (5) of section 12.-02(a) has standing to deny a husband's paternity.

the presumption has been close to irrebuttable. However, since the cited cases were decided, the legislature has significantly altered the Family Code. The changes recognize additional factual circumstances that can give rise to a presumption of biological paternity. *See* Tex.Fam.Code Ann. § 12.02(a) (Supp.1991) [added by Act of June 14, 1989, Tex.Gen.Laws ch. 375, § 6, at 1478]. One of the new sets of circumstances, consenting in writing to be named a child's father on the birth certificate, gives rise in the present case to the presumption that Vargas is Jessica's biological father. *See* § 12.02(a)(4).

 Although we cannot assume that the legislature intended any of the newly created presumptions automatically to trump that of the legitimacy of a child born into an existing marriage, neither may we say that the legislature intended the existing presumption always to outweigh the newly recognized presumptions. Because the legislature refrained from expressly ascribing greater weight to one circumstance over others, we will likewise refrain from unduly restricting the trial court's discretion.[3]

Logic, more than anything else, compels the conclusion that the trial court in the present case did not abuse its discretion in holding Vargas to be Jessica's legal father for purposes of further probate proceedings. The trial court's decision rested on the following facts: Espiricueta had stipulated that Vargas was Jessica's biological father; Espiricueta had not lived with Luna during the two years preceding Jessica's birth; Espiricueta lived with Vargas for at least two months before Jessica was born; Vargas, by Espiricueta's own admission, told hospital officials that he was Jessica's father and knew that he was being listed on the birth certificate as her father; Luna and Vargas each saw Jessica only two or three times before her death; Espiricueta called Vargas after the fire so that he could see Jessica before her death; and Espiricueta gave the coroner Vargas's name when asked to identify Jessica's father for the death certificate. These facts, considered along with the agreement of all parties that Vargas was Jessica's biological father, justified the trial court in concluding that he was her legal father. On this record, we decline to hold that the trial court abused its discretion.

We overrule appellant's points of error and affirm the trial court's judgment.

The trial court has broad discretion in determining which are the "weightier considerations of policy and logic."

---

**3.** We do *not* hold, however, that the several presumptions created by section 12.02(a) of the Family Code must always be given equal weight.