SOMERVILLE 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN





 





NO. 3-92-456-CV





CITY OF SOMERVILLE, CITY OF NEW WAVERLY


AND OFFICE OF PUBLIC UTILITY COUNSEL,



 APPELLANTS


vs.





PUBLIC UTILITY COMMISSION, GULF STATES UTILITIES COMPANY


AND TEXAS INDUSTRIAL ENERGY CONSUMERS,



 APPELLEES



 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT



NO. 91-9073, HONORABLE F. SCOTT McCOWN, JUDGE PRESIDING



 




 This appeal arises from a suit for judicial review of an order issued by the Public
Utility Commission of Texas (the "Commission") granting Gulf States Utility Company ("Gulf
States") an increase in its retail electric rates. The Cities of Somerville and New Waverly (the
"Cities") and the Office of the Public Utility Counsel ("OPUC") brought suit in district court
seeking judicial review of the Commission's order. The district court affirmed the Commission
order in large part, but remanded the case to the Commission on various federal income tax
questions. We will affirm the district court's action on the tax questions, but reverse the
affirmance of the Commission's adoption of the non-unanimous settlement stipulation ("NUS")
and render judgment that that portion of the Commission order be reversed and the cause
remanded to the Commission for action consistent with this opinion.



PROCEDURAL BACKGROUND


 This case originated in 1989 when Gulf States filed an application with the
Commission seeking an $88 million increase in retail electric rates. The Commission styled Gulf
State's application as docket number 8702 and conducted an extensive evidentiary hearing on the
application before several Commission administrative law judges. (1) Following the conclusion of
these hearings, the hearing examiners assigned to this case issued a 213-page examiner's report
summarizing the evidence and testimony presented during the hearing and recommended a retail
electric rate increase of approximately $9 million. The examiners later modified this
recommendation and proposed a larger rate increase of $14 million.

 After the examiner's report was issued, all but two of the parties involved in the
case initiated extensive settlement negotiations in order to resolve the case before it was submitted
to the Commission for final disposition on the merits. OPUC and the City of Somerville did not
participate in these negotiations. (2) The parties to the settlement negotiations eventually agreed to
a $30 million rate increase and submitted their proposed resolution of the case to the Commission
in the form of an NUS.

 After notice to all parties, on March 20, 1991, the Commission held a hearing on
the NUS submitted by the settling parties. During this hearing, the Commission allowed OPUC
and the City of Somerville to present objections to the NUS. Following this hearing, the
Commission issued a final order, dated March 22, 1991, approving rates consistent with the
NUS. (3) OPUC and the Cities subsequently brought a suit for judicial review pursuant to section
69 of the Public Utility Regulatory Act ("PURA") (4) and the Administrative Procedure Act
("APA"). (5) The district court overruled all of the points of error presented except for those points
attacking the federal income tax expense figure adopted by the Commission. Accordingly, the
district court reversed the Commission's final order and remanded the case to the Commission
with instructions that it recalculate the federal tax expense figure.



DISCUSSION


1.  The Non-Unanimous Settlement Stipulation

 OPUC's sole point of error and the Cities' seven points of error essentially address
the role of the NUS in the Commission's decision of this cause. The crux of the Cities' position
in their first six points of error is that it is never permissible for the Commission to base its
decision in a rate case, in part, on an NUS. Thus, the Cities argue that the Commission's use of
the NUS in this case was arbitrary and capricious. We disagree. In previous cases we have held
that the Commission may base its final order, in part, on an NUS, provided certain conditions are
met. See City of El Paso v. Public Util. Comm'n, 839 S.W.2d 895, 903 (Tex. App.--Austin 1992,
writ granted); see also Cities of Abilene v. Public Util. Comm'n, 854 S.W.2d 932, 937-40 (Tex.
App.-- Austin 1993, writ requested). Accordingly, we overrule the Cities' first six points of error
to the extent that they contend that a Commission decision based, in part, on an NUS is never
proper.

 We will now consider the Cities' final point of error and OPUC's sole point of
error, both of which question the sufficiency of the factual findings issued with the Commission's
final order. OPUC, while recognizing that an NUS is permissible, contends that these findings
of fact are not sufficient to determine whether the use of an NUS in this case complied with the
requirements we set out in City of El Paso. OPUC argues that the Commission's findings of fact
neither explain the basis for the Commission's final order, nor are sufficient to determine whether
the final order is supported by substantial evidence in the record. We agree.

 In City of El Paso, we set out two requirements that the Commission must meet in
order to consider an NUS as part of its final order. First, the Commission must afford any non-stipulating party the opportunity to be heard on the merits of the stipulation. City of El Paso, 839
S.W.2d at 903. Second, the Commission must make an independent finding, on the merits, that
the terms of the stipulation are fair, just and reasonable, and are supported by evidence in the
record. Id. This second requirement reflects the rule that an agency's decision, whether or not
based on an NUS, must be supported by substantial evidence. (6) APA § 2001.174(2)(E); see also
Texas State Bd. of Dental Examiners v. Sizemore, 759 S.W.2d 114, 116 (Tex. 1988), cert. denied,
490 U.S. 1080 (1980). We believe that the Commission complied with the first requirement by
allowing OPUC and the Cities' the opportunity to present arguments against the stipulation during
the May 1991 hearing. However, we do not believe that the findings of fact incorporated in the
Commission's final order are sufficient to determine whether the order is supported by substantial
evidence in the record and, therefore, we conclude that the Commission's final order does not
meet the second requirement of City of El Paso.

 Section 2001.141(b) of the APA requires an administrative agency to issue findings
of fact and conclusions of law with every final decision. (7) Although the APA does not delineate
standards for judging the sufficiency of the findings required under section 2001.141(b), effective
judicial review of an agency's decision requires at least a minimal level of factual findings in order
for a reviewing court to determine whether the agency's decision has support in the evidence. 
While there is no precise form for an agency's articulation of underlying facts, these findings
should be sufficient to serve the purpose for requiring factual findings, which is to inform the
parties and the courts of the basis for the agency's decision so that the parties may intelligently
prepare an appeal and so that the courts may properly exercise their function of judicial review. 
Texas Health Facilities Comm'n v. Charter Medical-Dallas, Inc., 665 S.W.2d 446, 451-52. See
generally John Powers, Judicial Review of the Findings of Fact Made by Texas Administrative
Agencies in Contested Cases, 16 Tex. Tech. L. Rev. 475, 479-83 (1985). The Commission's
factual findings, therefore, should be treated as "more than a technical prerequisite." Charter
Medical-Dallas, 665 S.W.2d at 451. 

 Furthermore, requiring the Commission to issue sufficient factual findings to allow
for proper judicial review is especially important in cases where the Commission's decision is
based, as in this case, on an NUS. As we recognized in Cities of Abilene, there is a significant
temptation for the Commission to merely adopt an NUS without requiring the utility to meet its
burden of proof. (8) Cities of Abilene, 854 S.W.2d at 938-39. Therefore, in City of El Paso, we
emphasized that when the Commission bases its final decision on an NUS, it must resolve the case
on the merits and make an independent finding that the resolution of the case is "fair, just and
reasonable." City of El Paso, 839 S.W.2d at 903. Otherwise, by merely adopting the terms and
proposed factual findings contained in the NUS without considering the merits of the case, the
Commission would be abdicating its statutory responsibility to decide the controversy. (9) In City
of El Paso, we concluded that the Commission's resolution of the case on the merits was
supported by substantial evidence in the record. In City of El Paso, the Commission held
extensive evidentiary hearings which resulted in the issuance of an examiner's report containing
evidentiary summaries and proposed factual findings. In its final order, the Commission adopted
237 findings of fact consistent with the NUS submitted in that case. The findings of fact set forth
the basis of the Commission's decision. (10) Accordingly, we concluded that the Commission
independently had resolved the case on the merits and that the Commission's resolution was
supported by substantial evidence. City of El Paso, 839 S.W.2d at 903-04.

 In the present case, however, we hold that the Commission's final order does not
contain the minimum level of factual findings necessary to determine whether the Commission's
resolution of the case is supported by substantial evidence. (11) The Commission's factual findings
are deficient because they exclude critical underlying variables that allegedly support the
Commission's decision to grant Gulf States a $30 million rate-base increase. (12) This $30 million
figure should be based on an intricate and complex series of underlying calculations and schedules
which, when linked, comprise the analytical basis justifying a rate increase. While we recognize
that a reviewing court may not possess the technical expertise to fully assess the analysis
supporting a rate increase, a reviewing court must at least be provided with basic factual findings
by the Commission to determine whether the rate increase approved by the Commission has
evidentiary support. For example, in the present case, the Commission's findings of fact do not
include the basic rate of return that Gulf States was allowed. (13) Nor do the findings adopted by
the Commission detail the underlying variables used to calculate Gulf States' retail base-rate
electric revenue requirement and the resulting increase in retail base rates. (14) Thus, in contrast to
the findings involved in City of El Paso, the factual findings in this case fail to provide sufficient
factual support for the rate increase approved by the Commission in order to allow a reviewing
court to determine whether the increase has support in the hearing transcripts or the examiner's
report. (15)

 Our basic disagreement with the dissenting opinion is its identical treatment of all
settlement agreements, be they unanimous or non-unanimous. To paraphrase one of our great
historical documents--all settlement agreements are not created equal. The dissent argues that once
a utility gets a sole (16) contestant to agree with its position and enters into an NUS, then all of the
contested-case procedures and substantive guarantees of PURA are no longer required. The
dissent states: "Typically the settling parties relinquish, expressly or by necessary implication,
many if not all the procedural formalities and safeguards that are incidental to formal
adjudications." Slip opinion at 9. Query: What about the rights of the nonsettling parties? Do
they forfeit their rights to a contested-case hearing and a fair and just adjudication of the case by
the Commission as a result of some of the contesting parties agreeing to settle? The dissent's view
of things is that once some of the contestants agree to settle, the Commission is no longer required
to even file findings of fact and conclusions of law giving the basis for the Commission's decision. 
Further, according to the dissent, the nonsettling parties are left to challenge the NUS solely on
the basis that the Commission somehow abused its discretion in approving the NUS. As a
practical matter, the end result of the dissent's suggested informal procedure emasculates the
rights of the nonsettling parties to challenge by any meaningful procedure the rate increase
provided for in the NUS. Finally, the dissent's suggested informal procedure would virtually
eliminate judicial review of Commission decisions. As we read the dissenting opinion, the
Commission can approve the NUS without the necessity of a hearing and most importantly,
without justifying its decision with the introduction of any evidence supporting the proposed rate
increase. Thus, not only is the Commission relieved of its obligation to justify its decision by the
filing of findings of underlying facts, but also that decision does not even need to be based upon
substantial evidence in the record. This approach violates the precepts this Court set forth in City
of El Paso for Commission approval of an NUS and effectively deprives the nonsettling parties
of all rights before the Commission because of the existence of an NUS entered into by some of
the parties to the dispute. We suggest that the procedure put forward by the dissent is not
workable when the agreement is not unanimous.

 Our decision today is not meant to impede or retard the use of settlement
agreements, be they unanimous or non-unanimous, to resolve disputes before the Commission. 
On the contrary, we regard the settlement of these complex, expensive, and often time-consuming
cases at the Commission level to be a worthwhile goal. As a consequence, we do not seek to
dictate the particular form that the Commission's findings of fact must take; nor do we prescribe
the particular findings of fact that are necessary to uphold the Commission's order. See Goeke
v. Houston Lighting & Power Co., 797 S.W.2d 12, 15 (Tex. 1990); State Banking Bd. v. Allied
Bank Marble Falls, 748 S.W.2d 447, 448-49 (Tex. 1988). 

 In Goeke, the Commission denied the application by Houston Lighting and Power
Company ("HL&P") to amend its certificate of convenience and necessity in order to construct
new high voltage transmission lines. The Commission's decision turned on its conclusion that
HL&P had failed to prove that the need for the new lines outweighed the detrimental impact of
the project. The supreme court ruled that the Commission's final order contained findings of fact
sufficient to allow a reviewing court to conduct a proper review of the Commission's decision. 
Goeke, 797 S.W.2d at 14. In its decision, the court cited specific factual findings which, it
concluded, supported the Commission's finding that HL&P had failed to meet its burden of proof. 
Id. 

 In the present case, however, the Commission's abbreviated findings of fact do not
include the elements necessary to review the Commission's decision, since the key variables and
assumptions supporting this decision are missing. We conclude, therefore, that the factual
findings supporting the Commission's final order in the present case were insufficient to permit
proper judicial review of the Commission's final order, especially since the final order was based,
in part, on an NUS. Accordingly, we sustain OPUC's sole point of error and the Cities' seventh
and final point of error.



2.  Federal Income Tax Expense Calculations

 Gulf States and the Commission assert two points of error contending that the
district court erred in holding that the Commission improperly calculated Gulf States' federal
income tax expenses. The district court concluded that the Commission's calculation of Gulf
States' federal income tax expenses excluded tax deductions that the utility received on capital
expenditures that the Commission had previously disallowed on a showing that Gulf States had
not proven their prudence. (17) Applying the "actual taxes paid doctrine" articulated in Public Utility
Commission v. Houston Lighting & Power Co., 748 S.W.2d 439 (Tex. 1987) and Public Utility
Commission v. GTE-SW, 833 S.W.2d 153 (Tex. App.--Austin 1992, writ granted), the district
court ruled that these deductions must be used to reduce Gulf States' federal income tax expense
for rate-making purposes. According to the actual taxes paid doctrine, a utility is entitled to rates
"based only on the tax expense that had been actually incurred." Houston Lighting & Power, 748
S.W.2d at 442. Thus, any tax savings that a utility receives must be included in its federal income
tax expense calculations for rate-making purposes, even when the tax savings arises from
disallowed expenses. Gulf States and the Commission attempt to distinguish these prior cases by
arguing that the disallowed expenses in those cases involved non-capital expenses while in the
present case the disallowed expenses are capital expenses. Accordingly, Gulf States and the
Commission contend that deductions for disallowed capital expenses should not be subject to the
actual taxes paid doctrine. We disagree.

 The underlying principle guiding the supreme court in Houston Lighting & Power
was that tax savings actually enjoyed by the utility "should inure to the benefit of the ratepayers." 
748 S.W.2d at 422. Consequently, a utility's federal income tax expenses for rate-making
purposes should take into account tax savings on all deductible expenses, whether the Commission
allows or disallows those expenses. GTE-SW, 833 S.W.2d at 169. We believe that this principle
reflects a policy judgment that the ratepayers should not be required to pay for disallowed
expenses, either directly or indirectly. Section 41(c)(3) of PURA provides that the Commission
should not consider disallowed expenses in assessing a utility's revenue requirement. (18) However,
if disallowed but deductible expenses are not considered in calculating a utility's federal income
tax expense for rate-making purposes, the ratepayers will indirectly incur a percentage of those
disallowed expenses equal to the utility's federal income tax rate. 

 Gulf States and the Commission contend that subjecting disallowed capital expenses
to the actual taxes paid doctrine would violate the "normalization" requirement of the Internal
Revenue Code. The Internal Revenue Code allows a utility to depreciate its capital assets on an
accelerated basis while calculating its income tax expenses for rate-making purposes on a straight-line basis. Consequently, in the initial period that the utility depreciates an asset, ratepayers will
pay a higher level of income tax expenses than the utility actually pays. In later periods, however,
the income tax expenses calculated for rate-making purposes will be less than those actually paid. 
Thus, normalization is a process for allocating the burdens and benefits of federal taxes and
deductions over the life of the asset. (19) Gulf States and the Commission contend that requiring
them to pass the tax savings of disallowed capital expenses to ratepayers would violate
normalization requirements and prevent the utility from depreciating its capital assets on an
accelerated basis. We disagree with this argument.

 In GTE-SW, we rejected GTE's contention that the actual taxes paid doctrine would
violate normalization requirements. 833 S.W.2d at 166-67. Normalization concerns the
allocation of tax savings from allowable expenses. Under normalization, the ratepayers never pay
more income tax expenses than those tax expenses actually incurred by the utility over time. 
Income tax expenses higher than those actually incurred by the utility during the early life of an
asset are eventually offset in later periods by income tax expenses that are lower than those
actually paid. Id. This spreading of allowable expenses, however, is far different than calculating
tax expenses for rate-making purposes by pretending that the disallowed expenses are not going
to be deducted from the actual federal taxes paid by the utility. As a consequence, we see no
reason in the present case to depart from our conclusion in GTE-SW that the actual taxes paid
doctrine does not violate normalization requirements, even if the tax savings at issue arise from
disallowed capital, as opposed to non-capital, expenditures. Accordingly, we overrule all of Gulf
States' and the Commission's points of error.



CONCLUSION


 We affirm that part of the district court's judgment remanding the case to the
Commission on the federal income tax questions, but reverse the district court's affirmance of the
Commission's order adopting the NUS, and render judgment that that portion of the Commission
order be reversed and the cause remanded to the Commission generally for action consistent with
this opinion.



 

 Mack Kidd, Justice

Before Justices Powers, Kidd and B. A. Smith

Affirmed in Part; Reversed and Rendered in Part

Filed: November 3, 1993

Publish

1.   This hearing encompassed 51 days of testimony between September 5, 1989, and
December 18, 1990.
2.   The City of New Waverly participated in the settlement negotiations, but withdrew
its support for the settlement proposal after the Commission issued its initial final order
on March 22, 1991.
3.   Following motions for rehearing, the Commission issued a second final order, dated
May 2, 1991, which did not significantly depart from the substance of the first order.
4.   Tex. Rev. Civ. Stat. Ann. art. 1446c (West Supp. 1993).
5.   The Administrative Procedure and Texas Register Act is nonsubstantively codified
in the Government Code and renamed the Administrative Procedure Act. Act of May 4,
1993, 73d Leg., R.S., ch. 268, sec. 1, §§ 2001.001-.902, 1993 Tex. Sess. Law Serv. 587,
737-54 (to be codified as Administrative Procedure Act, Tex. Gov't Code Ann. §
2001.001-.902) (effective Sept. 1, 1993).
6.   The requirement that there be evidentiary support for the Commission's decision is
equally applicable in the case of an NUS because the Commission's resolution of the case
must be on the merits. "[E]ven if there is a lack of unanimity [in the stipulation], it may
be adopted as a resolution on the merits." Placid Oil Co. v. FPC, 483 F.2d 880, 893 (5th
Cir. 1973) (emphasis in original).
7.   The relevant text of APA § 2001.141(b) states, "A decision that may become final
under Section 2001.144 must include findings of fact and conclusions of law, separately
stated." A.P.A. § 2001.141(b).
8.   [8]  Cities of Abilene addressed the concern that the adoption of an NUS might raise a due-process problem by unintentionally shifting the burden of proof from the utility to the
opponents of the NUS. Cities of Abilene, 854 S.W.2d at 938-39.
9.   [9]  The text of PURA states: "It shall be the duty of the regulatory authority to insure that
every rate made, demanded, or received by any public utility, or by any two or more public
utilities jointly, shall be just and reasonable." PURA § 38.
10.   The Commission's factual findings also included references to attached schedules
detailing the underlying variables supporting the rate-base increase approved by the
Commission.
11.   The examiner's report issued in this case contained 234 findings of fact. The
Commission's final order adopted 72 findings of fact. 
12.   In its final order the Commission declared that it was "not endorsing or approving
any ratemaking principle or method underlying the [NUS] Joint Recommendation."
13.   The rate of return, when multiplied by a utility's total invested capital, yields the
return that the utility is allowed on its assets. This variable is added to operating costs,
tax costs and other expenses to calculate the utility's revenue requirement, which is a
critical factor in determining the amount of the rate-base increase.
14.   The Commission's finding of fact number 10 states:


The Commission finds rates consistent with the [NUS] filed on March 20,
1991, to be reasonable and in the public interest and that the reasonable
and necessary Texas retail base rate electric revenue requirement of Gulf
States is $449,546,125. This revenue requirement represents a $30 million
increase in Texas retail base rates.
15.   The Commission's final order did not include schedules or other calculations
supporting the $30 million rate-base increase.
16.   It is true that in this case the vast majority of contesting parties agreed to the NUS. 
However, the rule contended for by the dissent makes no distinction whether a minority or
majority of the contestants agree to settle. Furthermore, it is noteworthy that one of the
nonsettling parties was OPUC whose public duty is to represent residential and small
commercial ratepayers before the Commission. The dissent continually refers to this NUS as
an "agreed settlement" between the essential parties to the case. Surely, the dissent does not
suggest that OPUC's presence is non-essential or irrelevant to the disposition of this contested-case.
17.   These disallowed expenses arose from the utility's River Bend Nuclear Plant
project. In an earlier rate case, the Commission concluded that Gulf States had not met
its burden of proving that $1.4 billion of the project's costs were prudent and,
consequently, disallowed those expenditures for rate-making purposes. See Coalition of
Cities for Affordable Util. Rates v. Public Util. Comm'n, 798 S.W.2d 560 (Tex. 1990).
18.   PURA § 41(c)(3).
19.   See generally Elizabeth Warren, Tax Accounting in Regulated Industries: Limitations on
Rate Base Exclusions, 31 Rutgers L. Rev. 187, 187-94 (1978).