Filed 10/01/24

| VERMONT SUPERIOR COURT | | CIVIL DIVISION |
|---|---|---|

VERMONT SUPERIOR COURT

Washington Unit
65 State Street
Montpelier VT 05602
802-828-2091
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 23-CV-03565

---

Vermont Human Rights Commission v. Vermont Agency of Education

---

Opinion and Order on the Agency of Education's Motion to Dismiss

Plaintiff the Vermont Human Rights Commission (the "HRC") claims that the Vermont Agency of Education (the "Agency"), the sole defendant in this case, violated the Vermont Fair Housing and Public Accommodations Act (the "Act"), 9 V.S.A. §§ 4500–4507. The HRC maintains that the Agency violated the Act by discriminating against Mr. Mario Macias, Director of Guidance at Burlington High School (BHS) from 2016 to 2019, on the basis of race and color in the course of investigating and prosecuting him for unprofessional conduct and incompetence. His professional license eventually was revoked. The HRC seeks relief in the public interest and for the benefit of Mr. Macias.

The Agency has filed a motion to dismiss for failure to state a claim. Vt. R. Civ. P. 12(b)(6). It argues: (1) the complaint improperly attributes non-Agency conduct to the Agency; (2) the administrative licensing proceeding collaterally estops any assertion of discrimination here; (3) all individual actors mentioned in the complaint are entitled to absolute, prosecutorial, or qualified immunity that, in turn, automatically immunizes the Agency; and (4) any discrimination claim arising out of the administrative licensing proceeding is not subject to the Act.

Oral argument on the motion took place on August 27, 2024. The HRC was represented by Mitchell Rotbert, Esq. The Agency was represented by Assistant Attorney General Patrick Gaudet.

I.     Procedural Standard

A motion to dismiss for failure to state a claim faces a high bar. The Vermont Supreme Court has described the familiar standard for Rule 12(b)(6) motions to dismiss for failure to state a claim as follows:

> "A motion to dismiss . . . is not favored and rarely granted." This is especially true "when the asserted theory of liability is novel or extreme," as such cases "should be explored in the light of facts as developed by the evidence, and, generally, not dismissed before trial because of the mere novelty of the allegations." In reviewing a motion to dismiss, we consider whether, taking all of the nonmoving party's factual allegations as true, "'it appears beyond doubt' that there exist no facts or circumstances that would entitle the plaintiff to relief." We treat all reasonable inferences from the complaint as true, and we assume that the movant's contravening assertions are false.

*Alger v. Dep't of Labor & Indus.*, 2006 VT 115, ¶ 12, 181 Vt. 309, 316–17 (citations omitted); *see also* 5B A. Benjamin Spencer, *et al., Fed. Prac. & Proc. Civ.* § 1357 (4th ed.) ("Ultimately, the burden is on the moving party to prove that no legally cognizable claim for relief exists.").

The Agency submitted into the record voluminous exhibits in support of its motion, including: (a) the Agency licensing investigation activity log and report/recommendation; (b) the formal administrative charging document and supporting affidavit; (c) the supplemental formal charging document and amended recommendation and supporting affidavit; (d) the final decision of the hearing panel; (e) Mr. Macias's appellate brief to the State Board of Education; (f) the Secretary's appellate brief; (g) the report of the review subcommittee and proposed appellate decision; and (h) the State Board of Education's

decision on appeal. The Agency's position seems to be that because the HRC refers in the complaint to the administrative process generally, it is free to rely on any documents generated in or reflecting that administrative process. The HRC disagreed.

In material respects, the Court agrees with the HRC's position regarding the scope of the record. The record for Rule 12(b)(6) purposes generally is limited to the four corners of the complaint and any attachments to it. *See Nash v. Coxon*, 152 Vt. 313, 314–15 (1989) ("[I]f matters outside the pleadings are presented and not excluded by the court, the motion to dismiss must be treated as one for summary judgment." (internal quotation and citation omitted)). There is a limited exception: documents sufficiently referred to and relied upon in the complaint may properly be considered in a motion to dismiss even if not attached to the complaint. *See Kaplan v. Morgan Stanley & Co.*, 2009 VT 78, ¶ 10 n.4, 186 Vt. 605, 609.

In this case, the complaint does not sufficiently cite and rely upon all of the documents submitted by the Agency to warrant their consideration by the Court at this juncture. Merely referring to an administrative process does not bring within the scope of the rule all documents generated in that proceeding. The Court limits its analysis here to the four corners of the complaint and does not exercise its discretion under the Rule to convert the motion into one seeking summary judgment. *See Parada v. Banco Indus. De Venez., C.A.*, 753 F.3d 62, 67-68 (2d Cir. 2014) (decision on whether to exclude extra-record documents or transition motion to summary judgment is discretionary).

II.     Allegations of the Complaint

The thrust of the complaint is as follows. Mr. Macias, who is both Hispanic and African American, was the Director of Guidance at BHS from 2016 to 2019. Once he

started working there, his all-white staff were "exceedingly hostile" and complained about him. A white parent told him how he should do his job and did not think that he should be in the position of Director. BHS administrators took steps to help him with his leadership skills.

At an August 8, 2017, school board meeting, white parents and white, former guidance staff publicly accused him of being mean and disrespectful. Agency investigator Robert Stafford began a secret investigation of Mr. Macias involving unrecorded interviews with confidential witnesses, though neither the school district nor supervisory union had requested any such investigation. Mr. Stafford knew that administrators had taken, or were taking, corrective measures to address Mr. Macias's performance issues. In his eventual report, however, Mr. Stafford intentionally lied and said that no such measures had been or were being taken.

Based on Mr. Stafford's deceptive report, an investigation committee opened a formal investigation regarding unprofessional conduct (not described in the complaint) and incompetence regarding an incident involving the handling of a student transcript (not more specifically described in the complaint). The Agency also began investigating the principal and the director of special education, both white, in relation to the same transcript incident. Mr. Stafford conducted the formal investigation of Mr. Macias, during which he is alleged to have deviated in highly prejudicial ways from standard policies and practices as to how such investigations typically are undertaken and how they always have been done when investigating white educators.

The investigation as to the transcript incident was quickly closed as to the principal and the director of special education but pursued against Mr. Macias. Mr.

Macias's supervisors and BHS and District administrators did not believe the transcript incident was misconduct of any kind. One administrator who is Hispanic would have testified positively about Mr. Macias, but Mr. Stafford decided not to interview him.

A hearing panel eventually conducted the licensing hearing. One of the panel members was a close friend of Mr. Stafford. That member neither disclosed the relationship nor recused from the proceeding. The panel substantiated the allegations and revoked Mr. Macias's license. No white educator had ever faced revocation in similar circumstances.[1]

The implication running throughout the complaint is that Mr. Macias was treated harshly and unfairly as soon as he started working in Burlington and throughout the administrative licensing proceeding, and that the harsh and unfair treatment amounts to discrimination based on race and color.

III. Analysis

The Agency makes a number of arguments in support of its motion. The Court will address each in turn.

A. *Non-Agency Conduct*

The Agency contends that the HRC is improperly attributing non-Agency conduct to the Agency. The actions referred to in the complaint include those of the Standards Board for Professional Educators, 16 V.S.A. § 1693; the Board of Education, 16 V.S.A. § 161; and the hearing panel, 16 V.S.A. § 1702. These all may be entities that are

---

[1] What the similar circumstances may have been are not recited in the complaint, which was drafted in a conclusory manner throughout.

23-CV-03565 Vermont Human Rights Commission v. Vermont Agency of Education

independent of the Agency, although some are "attached" to the Agency for administrative purposes.

The Court need not delve deeper into that question, however, as the HRC has clarified that its claim in this case is exclusively predicated on the conduct of two Agency employees: Mr. Stafford and the Agency attorney appointed to prosecute the licensing action against Mr. Macias. Given that cabining, references in the complaint to the conduct of others is merely contextual and does not provide a basis for dismissal.

B.    *Collateral Estoppel*

The Agency argues that Mr. Macias had the opportunity to argue any claim of discrimination in the administrative proceeding, and the doctrine of collateral estoppel prevents the HRC from raising any similar claim here. "The elements of collateral estoppel are: (1) preclusion is asserted against one who was a party in the prior action; (2) the same issue was raised in the prior action; (3) the issue was resolved by a final judgment on the merits; (4) there was a full and fair opportunity to litigate the issue in the prior action; and (5) applying preclusion is fair." *In re Tariff Filing of Cent. Vermont Pub. Serv. Corp.*, 172 Vt. 14, 20 (2001).

The Court declines to get into the weeds of the Agency's collateral estoppel argument at this point. Even if the doctrine properly could be asserted against the HRC, which was not a party to the administrative proceeding, the argument depends heavily on reference to the content of the extrinsic documents submitted with the Agency's motion, which the Court has excluded from consideration under Rule 12(b)(6). Moreover, at the August 27 hearing, counsel for the Agency conceded that to the extent the doctrine applies to the HRC, it does so in a relief-specific manner. *See Walsh v. Cmty. Health Ctr.*

*of Richmond, Inc.*, No. 21CV3094ARRTAM, 2022 WL 4539264, at *6 (E.D.N.Y. Sept. 28, 2022).

Here, the HRC is plainly seeking relief that could not have been available in the administrative proceeding, including injunctive relief related to future discrimination for the benefit of the public and a civil penalty under the Act. Even if the doctrine applies, then, it will not be a basis for outright dismissal of this case.

Further, analysis of the issues surrounding the question of "privity" between Mr. Macias and the HRC, the application of the collateral estoppel factors set out above, and of the types of relief that are ultimately being sought in this action[2] are matters better addressed on a stronger factual record.

C.    *The Immunity Doctrines*

The Agency argues that each individual actor described in the complaint—had any of them been sued—would be protected by absolute, prosecutorial, or qualified immunity, all forms of official immunity. It then cites *Czechorowski v. State*, 2005 VT 40, ¶¶ 28–29, 178 Vt. 524, 533 for the proposition that when the liability asserted against the State derives from the conduct of State employees who have official immunity, that official immunity also immunizes the State. It asks the Court to engage in a full analysis of the potential immunity available to unnamed individual actors and, if such immunity exists, use it to sever the legal line of responsibility to the Agency for any of their alleged misconduct.

---

[2] At oral argument, the HRC was unsure, for example, whether it is actually seeking reinstatement for Mr. Macias.

In *Czechorowski,* there were several claims predicated on State employee conduct asserted in a derivative capacity against the State. In other words, the basis for suit against the State was the employee conduct attributed to the State. Regarding individual conduct that the Court found was subject to official immunity, the Court said as follows:

> Finally, plaintiff argues that the trial court erred by immunizing the State from suit for the actions of its employees Blinn and Monahan. Plaintiff's complaint against the State alleged that "[a]s a result of Blinn's and Monahan's . . . actions . . ., the [S]tate of Vermont is liable to the Plaintiff for the prosecution of the Plaintiff without probable cause and with malice." Thus, the claims against the State are derivative of the claims against the individual defendants, and because we have held that Monahan's challenged conduct was protected by absolute and qualified immunity, the State claims predicated thereon must also fail.

2005 VT 40, ¶ 28, 178 Vt. at 533.

For that legal conclusion, the Court cites to *Winfield v. State*, 172 Vt. 591, 594 (2001). In *Winfield*, however, the Court focused on the State employees' entitlement to qualified immunity. The Court then explained:

> Plaintiff's claims against the State are derivative of the tort claims against the individual defendants. Since we have held that the conduct complained of was within the scope of the individual defendants' discretionary duties, or simply failed to violate any established rights to which plaintiff was entitled, we discern no basis for the claims against the State. *See* 12 V.S.A. § 5601(e)(1) (state not liable for tort claims arising out of state employee's exercise of, or failure to exercise, discretionary duties); *Hudson*, 161 Vt. at 173–74 n. 1, 638 A.2d at 565 n. 1 (noting that although some courts have held that discretion in context of official immunity is broader than discretionary function exception to sovereign immunity, rationale of doctrine is same).

172 Vt. at 594.

The Court concluded in *Winfield* that the employees' conduct was protected by qualified immunity. As such, the conduct was within the employee's permissible

discretion. That was sufficient in that case also to demonstrate that the State's sovereign immunity was preserved under the statutory discretionary function exception to the waiver. Although the legal tests are different, qualified immunity and the discretionary function exception to the statutory waiver of the State's sovereign immunity both look to the employee's underlying exercise of discretion.[3]

The cited portion of *Czechorowski* is confusing and has rarely been applied by our Supreme Court,[4] but the Court does not interpret it (or *Winfield*) to extend official immunity to the State. "Official immunity is not derived from the state's sovereign immunity but from public policy considerations. Sovereign or governmental immunity protects only governmental entities; official immunity encompasses the conduct of public officers for purposes of personal tort liability." *See* 1 *Civ. Actions Against State & Loc.*

---

[3] While the inquires can overlap, as in *Winfield*, it is important to note that the discretionary function analysis for sovereign immunity is not necessarily coextensive with the "discretionary" component of the qualified immunity inquiry. The former provides automatic immunity to the sovereign where the underlying decision was based on the weighing of policy considerations. *See Searles v. Agency of Transp.*, 171 Vt. 562, 563–64 (2000). The latter is merely one component of the qualified immunity analysis, and it typically turns on whether the conduct was discretionary as opposed to merely ministerial. *See Cook v. Nelson*, 167 Vt. 505, 509–10 (1998). For individual officials, the question of immunity usually turns on the issue of whether the officer acted with objective reasonableness in light of existing law. *Id.*

[4] AAG Gaudet suggested at the hearing that Judge Toor ruled in *Austrian v. City of Burlington*, No. 24-CV-370, that *Czechorowski* extends official immunity to the State in the manner he advocates here. She did not. *Austrian* is a case of police misconduct asserted against a municipality, not the State. The individual officers are not defendants in that case, and Judge Toor did indicate that qualified immunity would have to be determined at some point. But her observation had nothing to do with *Czechorowski*. By statute: "When a municipality assumes the place of a municipal employee in an action as provided in subsection (b) of this section, the municipality may assert all defenses available to the municipal employee, and the municipality shall waive any defense not available to the municipal employee, including municipal sovereign immunity." 24 V.S.A. § 901a(c), cited in *Austrian v. City of Burlington*, No. 24-CV-370, Ruling on Motion to Dismiss at 19 (Aug. 5, 2024). There is no analogous statute in this case.

*Gov't* § 4:4. There are no individual capacity defendants in this case, so there is no need to consider official immunity. Otherwise, at the August 27 hearing, the Agency clarified that it is not asserting that the State (through the Agency) is protected by sovereign immunity from claims arising under the Act. There are no cognizable immunity issues in this case.

Additionally, *Czechorowski* arose in the contest of a claim under the Vermont Tort Claims Act, which contains an express waiver of the State's sovereign immunity, and focuses on the common-law tortious conduct of State actors. This action is not brought under that provision and a separate waiver of immunity applies to the claims at issue here. The focus is on a "governmental entity," and its alleged failure to adhere to the Act. 9 V.S.A. § 4501. To the extent the Agency seeks to argue that the State can never be liable, derivatively, when an employee against whom a claim is not even asserted is immune from suit, such an argument would contravene longstanding agency principles. *See Restatement (Second) of Agency* § 217 (a "principal has no defense because of the fact that: ... (ii) the agent had an immunity from civil liability as to the act"); *Glover v. Hryniewich*, 438 F. Supp. 3d 625, 637–39 (E.D. Va. 2020) (claim may proceed against principal where agent enjoyed qualified immunity), *aff'd in part, appeal dismissed in part sub nom. Glover v. City of Norfolk, Virginia*, 836 F. App'x 139 (4th Cir. 2020); *see also* George A. Bermann, *Integrating Governmental and Officer Tort Liability*, 77 Colum. L. Rev. 1175, 1187 (1977) ("Situations frequently arise in which it is appropriate to require the government to compensate for harm done by a public official, even though it is inappropriate to hold the official personally liable.").

Given the Court's concerns regarding the scope of *Czerhowowski*; the fact that HRC's claims fall under the Act, rather than the Tort Claims Act; and its tension with agency principles, the Court will not attempt to define its potential application to this case at the threshold. At a minimum, the Agency has not convinced the Court of its applicability to the instant circumstances to warrant dismissal.

D.      *Whether the Act Even Applies To The Alleged Conduct*

The Agency contends that the Act, by its terms, does not extend to a discrimination claim arising out of an administrative licensing proceeding. It argues that there is no identified "place" of public accommodation operated by the Agency at which any "accommodations, advantages, facilities, [or] privileges" were offered to the "general public" but denied to Mr. Macias.

Under 9 V.S.A. § 4502(a), "An owner or operator of a place of public accommodation or an agent or employee of such owner or operator shall not, because of the race, creed, color, national origin, marital status, sex, sexual orientation, or gender identity of any person, refuse, withhold from, or deny to that person any of the accommodations, advantages, facilities, and privileges of the place of public accommodation." "Public accommodation" is defined as "an individual, organization, governmental, or other entity that owns, leases, leases to, or operates a place of public accommodation." 9 V.S.A. § 4501(8). And "place of public accommodation" is defined as "any school, restaurant, store, establishment, or other facility at which services, facilities, goods, privileges, advantages, benefits, or accommodations are offered to the general public." 9 V.S.A. § 4501(1).

The HRC largely eschews any competing interpretations of specific Act language. Instead, it argues that the Vermont Supreme Court already has ruled that the Act broadly applies to all State conduct no matter the setting, relying on *Dep't of Corr. v. Hum. Rts. Comm'n*, 2006 VT 134, 181 Vt. 225 [hereinafter *Corrections*]. The language employed by the Supreme Court was facially sweeping and is supportive of the view that the word "place" has little significance in the law. Nonetheless, the Agency responds that the *Corrections* case arose in the unique disability discrimination context, which falls under a different statutory regime from all other forms of discrimination and for which the High Court had before it clear legislative history supporting an expansive view of its scope and application to the State. On that basis, the Agency encourages the Court to distinguish and disregard the case entirely on that basis.

The breadth of the *Corrections* decision and whether or how it may apply here, are weighty and untested matters to be sure. The Court appreciates the parties' efforts at grappling with them so far. Matters that are novel and address unresolved legal issues, however, are often best "explored in the light of facts as developed by the evidence" rather than at the dismissal stage. *Alger v. Dep't of Lab. & Indus.*, 2006 VT 115, ¶ 12, 181 Vt. 309, 316 (citation omitted). Such is the case here. The issues are nuanced and complicated and will be better resolved once the evidence has developed. *See* 5B A. Benjamin Spencer, *et al., Fed. Prac. & Proc. Civ.* § 1356 (4th ed.) (Rule 12(b)(6) "is not a procedure for resolving a contest between the parties about the facts or the substantive merits of the plaintiff's case."). Indeed, neither side has provided the Court with any legislative history regarding the specific provisions at issue in this case and neither has explored how using the term "place" as a limiting term may impact web-based services

that are provided by the government. Given such considerations, the Court deems it advisable to deny the request to establish the perimeters of the Act on a cold and limited record.

Conclusion

For the foregoing reasons, the Agency's motion to dismiss is denied.

Electronically signed on Wednesday, September 25, 2024, per V.R.E.F. 9(d).

Timothy B. Tomasi
Superior Court Judge